## Hetrick Estate

*Spencer D. Wareheim*, for trustee.

*S. S. Laucks, Jr., Frederick B. Gerber* and *Spencer R. Liverant*, for petitioners.

GROSS, P. J., March 20, 1957.—This is a proceeding instituted on petition of the trustees of the cemetery of the Friends Meeting House in Warrington Township, York County, filed on November 20, 1954, for an order of court, requiring York Trust Company, as trustee of an inter vivos cemetery trust, created by H. Bruce Hetrick, now deceased, to pay over the net income allowed to accumulate in its hands to petitioners. Hereinafter, we will refer to the trustees of the cem-

etery as "cemetery trustees," and to the York Trust Company as "trustee."

The issues here involved require a chronological statement of the facts, which are as follows:

On May 7, 1946, H. Bruce Hetrick, under and by virtue of an irrevocable instrument in writing, created an inter vivos trust by depositing with York Trust Company the sum of $10,000, to be invested in legal investments for trust funds and to pay the net income to settlor during his lifetime and after his death, to his wife, Ruth K. Hetrick, during the term of her natural life. After her death, the trust instrument disposes of the net income as follows:

"So much of the annual net income which shall be necessary shall be used for the upkeep of the Hetrick and Hayward burial lots in the Cemetery of the Friends' Meeting House, in Warrington Township, York County, Pennsylvania, and for taking care of all graves in said cemetery, for repairing the fences and buildings on said cemetery. Any income not required for said purposes shall be paid to the School District of Warrington Township, York County, Pennsylvania, to be used for general school purposes."

The wife of settlor predeceased him and settlor died August 11, 1948, unmarried and without issue, leaving to survive him a number of nephews by blood as his only next of kin.

Some authorities designate this kind of trust as an "honorary trust" and, although the question was not raised, its validity has been recently questioned by some courts. See 42 Dickinson Law Review 161. But it is now well settled in Pennsylvania that this type of gift or bequest is regarded as a trust possessing all the essential incidents thereof, notwithstanding the absence of a beneficiary. In Devereux's Estate, 48 D. & C. 491, Bolger, J., carefully examines and reconciles the cases on this subject and concludes:

". . . that the trustee becomes vested with a legal estate—not merely a power—with the duty of applying it to the purpose of the trust; that the lack of a *cestui que* trust, which normally results in there being no one having standing to compel the trustee to perform, is here supplied by the power and implementation of orphans' courts to supervise and control the activities of the trustee, *suo moto*, or upon the application of or on the failure of the testator's next of kin." (Italics supplied.)

See also Palethorp Estate, 69 D. & C. 500.

On March 27, 1951, we considered the liability of this trust for the payment of transfer inheritance tax. In our opinion, reported in 65 York 57, we found the cemetery of the Friends Meeting House is located adjacent to what is commonly known as Warrington Quaker Meeting House. The present church structure was erected in the year 1769, and the adjoining cemetery was established by the Friends or Quakers, as they are commonly called, about the year 1745.

The church and the cemetery are both unincorporated organizations. The cemetery is composed of several acres of land upon which several thousands of graves are located, not only of deceased Quakers, but of the people of all religious denominations formerly living in that community within a radius of a number of miles from this venerable meeting house.

In this cemetery lie buried the maternal Quaker ancestors of the writer of this opinion for the past 200 and more years, and the maternal ancestors of H. Bruce Hetrick, this decedent, also lie buried there for the same period of time.

The Hetrick and Hayward burial lots consist of three contiguous lots, each lot measuring 18 feet square and in form resemble the capital letter "L". At the top of this letter is located the Hayward lot. Adjacent to it, at the bottom of the letter, the lot of Augustus C. Het-

rick, the father of H. Bruce Hetrick, is located, and adjacent to it, at the right of the base of the letter, the lot of decedent, H. Bruce Hetrick is located.

On the Hayward lot are located the eight graves of the maternal grandparents, uncles and aunts of this decedent, and in the center of the lot is erected an antiquated central metal monument of a type now obsolete, with a base six feet long by three inches wide, and with a height of six feet. Metal plates are attached thereon, containing the names of the various persons buried on the lot.

On the lot of Dr. Augustus G. Hetrick, who was the father of H. Bruce Hetrick, this decedent, are located the seven graves of the parents, two sisters, a brother, a sister-in-law and a nephew of decedent. On this lot is erected a central monument of the best quality of selected Barre granite, with a base six feet, six inches long by three feet, six inches in width, and a height of seven feet, on which the names of the deceased persons buried on the lot are cut in by sand-blast. There are also head and footstones at each grave. A duplicate of this monument, as of 1951, it is estimated would cost $4,500.

On the lot of H. Bruce Hetrick, this decedent, are located graves of decedent, his wife and two sons, with appropriate head and footstones. There is no vacant place for additional burials on this lot. In the center of this lot is erected a magnificent monument of the best selected Barre granite, with a base nine feet long, three feet eight inches wide, and on which rests a shaft seven feet high. It is estimated that, when this monument was erected, about 20 years before the death of decedent, it cost about $3,000, but it is estimated by witnesses called at the hearing that a similar monument would now cost $11,000. It is with reference to the damage to the base of this monument that this opinion is being submitted.

The entire cemetery is underlaid with granite rock and, in opening graves, it is frequently necessary to do some blasting of these rocks, the result of which is to displace and sometimes damage other monuments and gravestones.

When we filed our opinion, on March 27, 1951, Thomas G. Cooke, now one of the petitioning cemetery trustees, estimated the annual cost of properly maintaining and keeping up the Hetrick and Hayward burial lots at $315; while David P. King, an experienced monument dealer, estimated that it would require annually around $400 for the upkeep of these burial lots.

The cemetery does now have an endowment fund of $6,000, raised by public subscription, and a life insurance fund, reputedly in the amount of $10,000, growing out of life insurance carried by H. Bruce Hetrick, both of which funds inure to the use and benefit of this cemetery, of the details of which this court has not been fully apprised. The individual graves are usually kept up by surviving relatives of the deceased person buried therein.

On November 20, 1954, the cemetery trustees filed their petition in this court, setting forth that, by reason of the death of both settlor and his wife, the net income from said trust should, at all times, be paid annually to the trustees of the said cemetery, to be applied to the uses and purposes set forth in the trust agreement, but that York Trust Company, trustee of the fund, while having made some annual payments of the net income on the said fund to the cemetery trustees, now refuses to make further payments and is accumulating the net income of the fund in its hands, and asked this court to order and direct the trustee to pay over to the cemetery trustees all accumulated income in its hands to the end that the

same may be applied by the cemetery trustees in furtherance of the purposes of the trust.

In response to a citation to show cause, the trustee answered by admitting the accumulation of income, but further averred that its reason for not making annual payments of net income to the cemetery trustees was because Charles Hoff, a nephew by blood of settlor and one of his nearest of kin, had made demands upon it to replace the damaged base of the family monument, located on decedent's lot, the cost of which it was then estimated to approximate the sum of $2,000 and, for this reason, the net income had not been annually paid to any person or for any use but has been allowed to accumulate in its hands until the legal disposition of the net income would be determined. By so doing, we think the York Trust Company, trustee, acted wisely.

Following the filing of the petition of the cemetery trustees and it appearing to the court that the trustee had never filed any account of its administration of the trust, we summarily ordered the trustee to file an account of its administration of the said trust from its inception, which account was filed on July 8, 1955, and came up regularly for adjudication and audit on September 7, 1955. No exceptions were filed to the account.

At the audit, the cemetery trustees and Charles Hoff and his brother, Dr. Henry B. Hoff, blood nephews of decedent and of his nearest next of kin, appeared, and the nephews contended that the base of the monument on settlor's lot was damaged beyond repair, and requested that the court order and direct the trustee of the fund to replace the original base with a new base.

The cemetery trustees objected to this request. Their attitude is somewhat vague and indefinite, but we understand it to be as follows: That the damage to the base of the monument is not of such extended char-

acter as to require a new base, that it can be repaired at a reasonable cost, that the cost of a new base would be so high it could not be paid out of the annual net income of the trust and that no part of the corpus of the trust could be used to purchase and set a new base.

There was no appearance at the audit by or on behalf of the School District of Warrington Township.

An analysis of the account of the trustee shows, as of the filing date, the following:

The present corpus of the trust is the sum of.........$9,979.47

Total gross income received by the trustee since the inception of the trust..........................$4,156.83

Credits against income for payments made are as follows:

To settlor for income accrued during his lifetime ...............................$ 818.08

To settlor's estate of income accrued during lifetime of settlor ...................... 152.78

For general upkeep of Friends Cemetery, including the Hetrick and Hayward lots, after the death of settlor................ 1,674.68

Amount expended specifically for the upkeep of the Hetrick and Hayward burial lots... 95.00

To School District of Warrington Township.. 255.48

For taxes, trustee's commission, counsel fees and costs ............................ 522.04

Total credits ........................... 3,518.06

Leaving balance of net income in trustee's hands.....$ 638.77

We are informed by the trustee that, since filing the account, additional net income has come into its hands in the amount of $690.14 which, added to the balance on the account as filed, makes a total accrued net income in the hands of the trustee as of January 1, 1957, of $1,328.91.

Because of the nature of this trust and the responsibility and duties of the court to supervise and control the activities of the trustee, we directed the trustee to have an investigation made of the cause and extent of the damage to the base of the monument and the cost

of repairing the same, supported by the expert opinion of several qualified monument dealers, and report back to the court, so that the court might be fully advised as to what is the most feasible and remedial course for the court to pursue with regard thereto under all the circumstances.

The trustee having made this investigation, a full hearing in the matter was held on June 22, 1956, which was attended only by the cemetery trustees and the nephews of decedent, with their respective counsel.

David P. King, a qualified monument dealer and stone cutter of more than 40 years experience, was called as a witness and testified in substance that decedent had, several years before his death, called to see the witness and spoke to him about having the damaged base of his family monument repaired. At that time, decedent told the witness that when the monument was erected, a portion of the corner of the base had been broken off and cemented back into position, but that it had now fallen off and the damage seemed to have extended itself, and he wanted to know from the witness the best plan of having the damage repaired.

At the request of decedent, the witness examined the monument and found positive evidence that the damage to the base was of a progressive character and would gradually become worse over the years. The witness recommended to decedent that the only thing to do was to replace the old base with a new base, but decedent never did anything about it.

Since decedent's death, the witness examined the monument on several occasions and found that the base itself weighs four and three-quarter tons and the shaft resting upon it weighs six and one-half tons, making a total of over 11 tons of granite stone. It is the expert opinion of the witness that the monument was not properly set in that this unusual weight is

not equally distributed over the foundation upon which the monument rests, thereby throwing more weight on the damaged corner of the base than anywhere else, and is the real cause of the damage.

The witness further testified that each of three or four examinations made by him since he was first spoken to by decedent clearly and positively showed that the damage was growing progressively worse and might eventually imperil the shaft itself, and the only remedy is the replacement of the old base with a new base at the estimated cost of $3,900.

Lloyd E. Grove, a monument dealer for the past 21 years, also examined this monument at the request of the trustee and testified that he took with him Chauncey Tyson, with 53 years of experience as a stone cutter, and they came to the same conclusion as to the probable cause and progressive character of the damage to the base that witness King arrived at. Although Mr. Grove admitted that Mr. King's theory as to the cause of the damage was probably right, he also advanced another theory by pointing out that it was possible that there could have been an invisible defect in the base itself and that it took years of weather beating for this defect to manifest itself and cause the corner of the base to crumble. He testified further that this sometimes happens, but was unable to say what the exact cause was for the crumbling of this corner of the base. He was convinced, however, that the only feasible thing to do was to replace it with a new base, and that the probable cost of doing so at the present time would approximate $4,000.

David E. Ness, a salesman of finished monuments, but with no experience as a stone cutter, recommended that a new base could be installed at the price of $2,843.

Mr. Cooke, one of the cemetery trustees, testified that decedent knew all about the damage to the base

of his monument, and that he talked with decedent about it, and that decedent expressed his opinion that there was a flaw in the granite which constitutes the base. Mr. Cooke doubted that the damage to the base of the monument was progressive because he said the damage in its present condition has existed for a rather long period of time.

Belle Anthony, also one of the cemetery trustees, objected to spending $3,900 to replace the old base, but thought that an expenditure of $500 would be a reasonable amount to repair the present base.

In view of the foregoing evidence, we think it not improper for the court to make the following statement.

We have viewed the monument erected by settlor, both before and after his death, and had several personal conversations with him about the damaged corner of the base. He was somewhat perturbed about it and was afraid the monument was permanently defaced, but stated to the writer that he did not regard it as of impending peril to the shaft, but was in doubt as to what ought to be done in order to correct the damage. On several occasions since the death of settlor, we had occasion to visit his grave and noticed the damage had somewhat extended. The cemented corner had long since fallen out and the damage had extended in width to between three and four inches clear down to the foundation on which the base is located, evidencing, in the opinion of the court, that the damage to the base is probably of a progressive nature.

Notwithstanding the informative scope of the investigation as supplemented by the personal observaations made by the court, there remains a combination of unresolved possibilities depending upon the extent to which the damage to the base may or may not progress in the future.

The facts and circumstances shown in the record cast a shadow, not upon the power of the court, but upon the appropriateness of the order of the court in supervising and controlling the activities of the trustee.

There is no evidence that the present damage to the base of the monument is of such extended character as to cause the shaft to topple down or even endanger its position so as to seriously impair the utility of the monument, but it is the positive opinion of two expert witnesses that the damage might progress to that point in the future. Nevertheless the evidence is clear that the damage now appearing has defaced and blemished the monument to the extent that it has been robbed in part of its original elegance and majesty.

H. Bruce Hetrick, settlor, was well known to the auditor of this opinion. They were personal friends for at least 65 years and during a period of 35 years, the mutual relationship of doctor and patient and attorney and client was sustained. Settlor was an eminent and sucessful practitioner of medicine in the upper end of York County, covering eight or nine townships and the included boroughs, for a period of almost 60 years. His father, Augustus C. Hetrick, with whom he was associated in the practice of medicine for many years, and his grandfather, Dr. Hayward, who preceded his father, were equally as prominent and successful in the practice of medicine in that vicinity. Indeed, the home in which Dr. H. Bruce Hetrick was born, located only a few hundred yards from this cemetery, was, without interruption, the homestead and office of these three good doctors for a period of over 180 years, and is now occupied by Dr. Henry B. Hoff, a great grandson of Dr. Hayward and a nephew of settlor, who, we are reliably informed, is carrying on the noble traditions of his illustrious ancestors.

Dr. H. Bruce Hetrick is entitled to have erected a beautiful and unblemished monument marking his grave. He indicated the kind of monument he wanted by having erected it before he died, and making provisions for its "upkeep" by his trust instrument. Although he did not, in the trust instrument, numerically classify the priority of the several purposes of the trust, he did give priority to position and consideration in the trust instrument to the use of the net income after his death and that of his wife by directing that "so much of the annual net income which shall be necessary shall be used for the upkeep of the Hetrick and Hayward burial lots, and for taking care of all graves in said cemetery, for repairing the fences and building of said cemetery."

It is therefore apparent and we may confidently assume that settlor's paramount intention was to create a trust, the net income of which would, after his own death and that of his wife, be used to keep up the burial lots and monuments erected thereon named in the trust instrument, and, therefore, under the power of this court to supervise and control the activities of a trust of this kind, our effort must be to find and carry out settlor's chief intent with a minimum disturbance to the general plan of the trust instrument.

In the case of a testamentary trust, the literal provisions of a will may be departed from so as to carry out what appears to be a superior or preferred intent, but when this is done, the object in view must always be to approximate as closely as possible to the scheme of testator which has failed by reason of intervening rights and circumstances: Disston's Estate, 257 Pa. 537; Ferguson Estate, 138 Pa. 208.

In Sternberger's Estate, 121 Pa. Superior Ct. 50, the Superior Court held that, regardless of specific directions for distribution of income at stated periods, the courts have held that the trustee may accumulate a

surplus from income if prudent management to prevent deficiencies requires it.

In Essig Estate, 167 Pa. Superior Court 66, the facts of which are quite similar to the case at bar, the Superior Court held as follows:

"Without violating any statutory or testamentary direction against accumulations, trustees may, within reasonable limits, retain temporarily a certain amount of surplus income in aid of the judicious management of the trust and to provide for future contingencies."

It is only an accumulation designed as a permanent addition to the corpus of the trust beyond the statutory period which is prohibited. See Spring's Estate, 216 Pa. 529; Sinnott's Estate, 310 Pa. 463; Howell's Estate, 180 Pa. 515; Mathues' Estate, 322 Pa. 358.

The trust instrument here does not permit an invasion of the principal for the upkeep of this monument. We must look entirely to the annual net income of the trust for that purpose.

When Dr. Hetrick, settlor, created this trust, he apparently did not contemplate that a contingency might arise which the normal flow of annual net income of the trust would not be sufficient to meet, and that, in case of an extraordinary contingency, as there appears to be in this case, it might require an invasion of the corpus or an accumulation of the income in order to carry out his paramount intention.

Webster's unabridged dictionary defines the word "upkeep", as a verb, to keep up, to support, to maintain, and, as a noun, act or cost of keeping up or maintaining; state of keeping in repair.

The same dictionary defines "repair" as the act or process of repairing; restoration to a sound or good state after decay.

Vol. 43 of Words and Phrases, at page 429, defines "upkeep" as follows: Upkeep means the act of keeping

up or maintaining; maintenance, repair. And Vol. 36 of Words and Phrases, at page 967, says, "repairing" includes any work or restoration of a former more perfect condition, and cites numerous cases to support it.

The "annual net income" as used in this trust instrument has reference more to the successive periods of time for the receipt of income than to fixing the periods for its disbursement. It does not mean that there shall be an *annual* expenditure of all net income.

In many respects, this trust must be regarded as sui generis. Our hereinafter decree will, therefore, be in the nature of a temporary withholding or suspension of the use of part of the net income pending the determination of the real character and effect of the future damage to the base of the monument, and for the purpose of creating a reserve fund, with leave to the trustee to submit to the court for approval a plan of expenditure to meet the present unsolved contingency which may then be resolved into a certainty.

We think it proper to say that these cemetery trustees are well known and highly respected citizens in the upper end of York County. Their religious birthright is that of the Society of Friends, with which philosophy of life they have been devoted adherents. Their voluntary and unselfish services rendered in maintaining this cemetery have covered a long period of years of devotion and sacrifice, but, because of the very nature of this trust, these cemetery trustees cannot be regarded as a beneficiary of the trust. They are only the agents of the York Trust Company, the trustee, for caring for and preserving these burial lots and as aids to the trustee in otherwise executing the trust.

It follows that grave doubt may be attached to the cemetery trustees' right to appear as a party or parties in interest in this proceeding. However, this proceed-

ing is not in the nature of a quarrel or a spirited legal contest between the cemetery trustees, the York Trust Company, trustee, and the next of kin of settlor, but partakes of the nature of a friendly proceeding to determine and clarify the duties and responsibilities of the trustee in the management and administration of the trust under the supervisory and controlling powers of this court.

The position of the cemetery trustees may be regarded in a sense as potential substituted trustees of the trust and, because of their valuable assistance heretofore rendered to the trustee and also to the court in this proceeding, they may, in another sense, be regarded in a measure as an amicus curiae. See discussions of Sinkler, Judge, in Devereux's Estate supra; and Ladner, Judge, in Palethorp Estate, supra.

The prolixity of this opinion, setting forth the reasons for our decree, may be excused, at least in part, by the fact that our decision may disturb the minds of the living whose final resting place will be in this cemetery, as well as the affections of relatives and friends of those now buried therein, and whose graves would be turfed and kept green through the kind generosity of their deceased benefactor.

We enter the following

## Decree

And now, to wit, March 20, 1957, it is hereby ordered, adjudged and decreed as follows:

First: The petition of Thomas G. Cooke, J. Ernest Hartman and Belle Anthony, trustees of the cemetery of the Friends Meeting House, in Warrington Township, filed on November 30, 1954, for an order against York Trust Company, trustee of a cemetery trust created by H. Bruce Hetrick, now deceased, by his instrument, dated May 17, 1946, is dismissed, without prejudice to the petitioners to renew the proceedings whenever it shall appear to the court to be proper and

advantageous to the administration and management of the trust.

Second: It is further ordered and decreed that all undistributed net income of said cemetery trust in the hands of the York Trust Company, trustee, as of January 1, 1957, amounting to the sum of $1,328.91, shall be withheld and set aside as a reserve fund and allowed to accumulate in the hands of the trustee for a period of three years from the date of this decree, or until the further order of the court made in the meantime for the purpose of defraying all costs of the upkeep, maintenance and repair of the Hetrick and Hayward burial lots in said cemetery as shall then be determined by the court to be feasible and proper.

Third: It is further ordered and decreed that the sum of $200 per annum of the net income of said trust, accruing after January 1, 1957, shall be withheld and set aside by said trustee for the period of three years from the date of this decree, or until the further order of the court made in the meantime and for the same purposes as set forth in paragraph second hereof.

Fourth: It is further ordered and decreed that the total net income from said trust so held, accumulated and to be accumulated as directed in paragraphs second and third of this decree, shall not be added to or become in any manner a part of the corpus of the said trust but may be invested as a separate fund and the income realized thereon added to the said designated income fund.

Fifth: We order and decree that this opinion and decree shall be considered an integral part of our adjudication of the account of the York Trust Company, trustee, which has been filed concurrently with this opinion and decree and that the costs of this proceeding, as shown in our adjudication, shall be paid out of the corpus of the trust.